# LAWRENCE COUNTY ET AL. *v.* LEAD-DEADWOOD SCHOOL DISTRICT NO. 40–1

No. 83–240.   Argued October 30, 1984—Decided January 9, 1985

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 270.

*Alan Raywid* argued the cause for appellants. With him on the brief were *John D. Seiver* and *Roger Tellinghuisen.*

*Deputy Solicitor General Claiborne* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Habicht, Carolyn F. Corwin, Anne S. Almy,* and *Anne H. Shields.*

*A. P. Fuller* argued the cause and filed a brief for appellee.*

JUSTICE WHITE delivered the opinion of the Court.

The issue presented in this appeal is whether a State may regulate the distribution of funds that units of local govern-

---

*\*Frederic Lee Ruck* filed a brief for the National Association of Counties et al. as *amici curiae* urging reversal.

*Mark V. Meierhenry,* Attorney General, and *Mark Smith,* Assistant Attorney General, filed a brief for the State of South Dakota as *amicus curiae* urging affirmance.

ment in that State receive from the Federal Government in lieu of taxes under 31 U. S. C. § 6902. The Supreme Court of South Dakota sustained a state statute requiring local governments to spend these moneys in the same manner as they distribute taxes, holding that it was not inconsistent with the federal law. Because the language and legislative history of the federal statute indicate that Congress intended local governments to have more discretion in spending federal aid than the State would allow them, we hold that the state statute is invalid under the Supremacy Clause. Hence, we reverse.

## I

The Payment in Lieu of Taxes Act, 31 U. S. C. § 6901 et seq.,[1] compensates local governments for the loss of tax revenues resulting from the tax-immune status of federal lands located in their jurisdictions, and for the cost of providing services related to these lands. These "entitlement lands" include wilderness areas, national parks, and lands administered by the Bureau of Land Management.[2] Under § 6902, the Secretary of the Interior is required to make annual payments "to each unit of general local government in which entitlement land is located."[3] The local unit "may use the payment for any governmental purpose." 31 U. S. C.

---

[1] The Payment in Lieu of Taxes Act formerly appeared at 31 U. S. C. § 1601 et seq. (1976 ed.). Title 31 of the United States Code was recodified in 1982 by Pub. L. 97–258, 96 Stat. 877 et seq. The recodification did not make any substantive change in the law. See H. R. Rep. No. 97–651, p. 3 (1982).

[2] Other "entitlement lands" are lands used by the Army Corps of Engineers for water resource development projects and dredge disposal areas, as well as lands on which semiactive and inactive military installations are located. See 31 U. S. C. § 6901(1).

[3] A "unit of general local government" is defined elsewhere in the Act to include "a county (or parish), township, . . . or city where the city is independent of any other unit of general local government." 31 U. S. C. § 6901 (as amended by Pub. L. 98–63, 97 Stat. 323). Special purpose public bodies, such as school boards, are not included in the definition. H. R. Rep. No. 94–1106, p. 12 (1976). See also 43 CFR § 1881.0–5(b)(2) (1983).

§ 6902(a).[4] Appellant Lawrence County has received in excess of $400,000 under the Act.

In 1979, South Dakota enacted a statute requiring local governments to distribute federal payments in lieu of taxes in the same way they distribute general tax revenues. S. D. Codified Laws § 5–11–6 (1980).[5] Since the county allocates approximately 60% of its general tax revenues to its school districts, the state statute would require the county to give the school districts 60% of the § 6902 payments it receives. The county, however, declined to distribute the funds in accordance with the state statute, claiming that the Payment in Lieu of Taxes Act gave it the discretion to spend the funds for any governmental purpose it chose.

This state court litigation arose after the county's federal court challenge to the state law was dismissed on jurisdictional grounds.[6] Appellee Lead-Deadwood School District

---

[4] Section 6902(a) provides in full: "The Secretary of the Interior shall make a payment for each fiscal year to each unit of general local government in which entitlement land is located. A unit may use the payment for any governmental purpose."

[5] The statute provides: "The county auditor shall distribute federal and state payments in lieu of tax proceeds in the same manner as taxes are distributed."

[6] The county originally sought a declaratory judgment that the state statute conflicted with the federal Act and was therefore invalid under the Supremacy Clause. The Federal District Court entered a declaratory judgment in favor of the county. *Lawrence County v. South Dakota,* 513 F. Supp. 1040 (SD 1981). The Court of Appeals for the Eighth Circuit vacated that judgment, however, concluding that the county's invocation of the Supremacy Clause did not convert the action into one arising under federal law for purposes of federal jurisdiction under 28 U. S. C. § 1331. 668 F. 2d 27 (1982). This ruling was erroneous. In *Shaw v. Delta Air Lines, Inc.,* 463 U. S. 85 (1983), we granted declaratory relief to a party challenging a state statute on pre-emption grounds, reaffirming the general rule that "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U. S. C. § 1331 to resolve." *Id.,* at 96, n. 14.

No. 40–1 then filed a complaint in state court, seeking a writ of mandamus to compel the county to distribute the federal funds in accordance with the state statute. The Circuit Court for the Eighth Judicial Circuit of South Dakota held that the state statute conflicted with federal law and was therefore invalid under the Supremacy Clause.

The South Dakota Supreme Court reversed. 334 N. W. 2d 24 (1983). The court noted that the only limit imposed on the local government by § 6902 is that the funds must be used for a "governmental purpose." Since support of school districts is a valid governmental purpose, the court concluded that the state statute was consistent with federal requirements. The court therefore found it unnecessary to go behind the plain language of the statute and examine its legislative history. Two justices dissented, concluding that the statute as a whole, along with the legislative history, indicated that Congress was directing the States to "keep their noses out of the manner in which a county would distribute these funds." *Id.*, at 27. We noted probable jurisdiction, 466 U. S. 903 (1984).

## II

Even if Congress has not expressly pre-empted state law in a given area, a state statute may nevertheless be invalid under the Supremacy Clause if it conflicts with federal law or "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984); *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). In determining whether the state statute at issue here impeded the operation of the federal Act, the South Dakota Supreme Court limited its inquiry to whether the funding of school districts was a "governmental purpose." Concluding that it was, the court found no inconsistency between the state and federal provisions. This plain language analysis, however, is seriously flawed.

The Act provides that "each unit of general local government"—in this case, the county—"may" use the moneys for

"any" governmental purpose. This language appears to endow local governments with the discretion to spend in-lieu payments for any governmental purpose. It seems to say that if the local unit chooses to spend all of the money on roads, for example, it could do so. Under the state statute, however, that is forbidden: the funds must be allocated among the various services in the same manner as other revenues. The State insists that since money used as the law directs would be spent on proper governmental services, there is no inconsistency with § 6902. Under this interpretation, the word "may" confers no discretion on local governments that is immune from state control. The last sentence of § 6902(a) is drained of almost all meaning, since had it been omitted, the legal position of local governments would be precisely as described by the South Dakota Supreme Court. The sentence would become a mere admonition not to embezzle and to spend federal money on proper purposes. At the very least, § 6902 is ambiguous with respect to the degree of discretion it confers on local governments. Contrary to the views expressed in the court below, it does not of its own force dispose of the county's case. Resort to other indicia of the meaning of the statutory language is therefore appropriate.

First, we note that the Department of the Interior, the agency charged with administration of the Act, has consistently adhered to the view that local government units retain the discretion to spend the in-lieu payments for any governmental purpose they choose. In 1977, soon after the Act was passed, the Department promulgated 43 CFR § 1881.2 (1983), which provides that "[t]he monies paid to entitled units of local government may be used for any governmental purpose." The Department has consistently interpreted the statute as foreclosing limitations on the use of in-lieu funds.[7]

---

[7] The regulation exempts from this discretion payments required to be allocated proportionately to school districts under 31 U. S. C. § 6904. See *infra*, at 267. Two courts have found these regulations consistent with

Brief for United States as *Amicus Curiae* 18. The inter-
pretation of an agency charged with the administration of a
statute is entitled to substantial deference, *Blum* v. *Bacon*,
457 U. S. 132, 141 (1982), if it is a sensible reading of the
statutory language, which it surely is in this case, and if it
is not inconsistent with the legislative history, an inquiry
that we now undertake.

The Payment in Lieu of Taxes Act was passed in response
to a comprehensive review of the policies applicable to the
use, management, and disposition of federal lands. Public
Land Law Review Commission, One Third of the Nation's
Land (1970).[8] The Federal Government had for many years
been providing payments to partially compensate state and
local governments for revenues lost as a result of the pres-
ence of tax-exempt federal lands within their borders. But
the Public Land Law Review Commission and Congress iden-
tified a number of flaws in the existing programs. Promi-
nent among congressional concerns was that, under systems
of direct payment to the States, local governments often
received funds that were insufficient to cover the full cost
of maintaining the federal lands within their jurisdictions.
Where these lands consisted of wilderness or park areas,
they attracted thousands of visitors each year. State gov-
ernments might benefit from this federally inspired tourism
through the collection of income or sales taxes, but these
revenues would not accrue to local governments, who were
often restricted to raising revenue from property taxes.
Yet it was the local governments that bore the brunt of the
expenses associated with federal lands, such as law enforce-

---

the Act. See *Altus-Denning School District No. 31* v. *Franklin County*,
568 F. Supp. 95, 102 (WD Ark. 1983); *Kendall* v. *Towns County*, 146
Ga. App. 760, 247 S. E. 2d 577 (1978). In *Altus-Denning*, the court also
held that an Arkansas statute, if interpreted to require counties to share
§ 6902 payments with school districts, would conflict with the Act's "any
governmental purpose" language.

[8] See S. Rep. No. 94–1262, pp. 5–6 (1976).

ment, road maintenance, and the provision of public health services.[9]

A second defect in the existing schemes was that the States had too much leeway with respect to the disbursement of the funds.

> "Many of the revenue sharing provisions permit the States to make the decisions on how the funds will be distributed. In far too many States, the result has been that the funds are either kept at the State level and not distributed to local governments at all or are parcelled out in a manner which provides shares to local governments other than those in which the Federal lands are situated and where the impacts of the revenue and fee generating activities are felt." S. Rep. No. 94–1262, p. 9 (1976).

The School District acknowledges that this legislative history evidences a clear intent to distribute funds directly to units of local government, bypassing the State. But it argues that the South Dakota statute poses no impediment to the accomplishment of this goal: federal money still flows directly to the county; none of it is thereafter "parcelled out" to other counties that have no federal lands within their borders; and the federal statute merely defines the "point of distribution" of funds, the State having authority to prescribe the "plan of distribution."

As we see it, however, Congress was not merely concerned that local governments receive adequate amounts of money, and that they receive these amounts directly. Equally important was the objective of ensuring local governments the freedom and flexibility to spend the federal money as they saw fit. The Senate Committee on Interior and Insular Affairs, for example, observed:

> "[T]oo many of the [existing] revenue sharing provisions restrict the use of funds to only a few governmental

---

[9] *Id.*, at 8–9. See also H. R. Rep. No. 94–1106, at 6.

services—most often the construction and maintenance of roads and schools. Yet, local governments are called upon to provide many other services to the Federal lands or as a direct or indirect result of activities on the Federal lands. . . . It is only the most fortunate of local governments which is able to juggle its budget to make use of those earmarked funds in a manner which will accurately correspond to its community's service and facility needs." *Ibid.*[10]

Similarly, the House Committee concluded not only that "payments under [the Act] should go directly to units of local government," but also that "these new payments should [not] be restricted or earmarked for use for specific purposes." H. R. Rep. No. 94–1106, p. 12 (1976). The floor debates on the Act are replete with similar statements.[11] The South Dakota statute, mandating that local governments spend these funds according to a specific formula, runs directly counter to this objective. If the State may dictate a "plan" of distribution, as the School District contends, it may impose exactly the kinds of restrictions on the use of funds that Congress intended to prohibit.

That Congress made a knowing choice to vest discretion in local governments over the expenditure of in-lieu moneys is apparent from the issues posed in the congressional hearings. The question of who should actually receive the payments under the Act was the subject of extensive discussion before the House Committee, and several alternatives were considered. Although a number of witnesses advocated payments directly to the State, others argued that the counties were the appropriate recipients because, among other consider-

---

[10] See also *ibid.*

[11] See 122 Cong. Rec. 25747 (1976) (statement of Rep. Weaver) (revenue-sharing payments are inadequate because earmarked for roads and schools, when needs are fire protection, sewage treatment, etc.); *id.*, at 25750 (statement of Rep. Baucus); *id.*, at 25754 (statement of Rep. McCormack).

ations, the counties were in the best position to determine what local functions were most in need of additional funds.[12]

Congress also recognized that the costs associated with maintaining and serving federal lands were varied and unpredictable, and that local governments needed the flexibility to allocate in-lieu payments to these needs as they arose. The House and Senate Committee Reports listed, as examples of services required by the presence of federal lands, law enforcement, public health, sewage disposal, libraries, hospitals, recreational facilities, and search and rescue missions.[13] The picture that emerges from the hearings on the Act is that there are many counties in which much of the land is owned by the Federal Government, and whose populations are markedly increased by tourists and hunters in the summer, in deer season, or on the weekends.[14] These transients suf-

---

[12] Hearings on H. R. 1678 and Related Bills before the Subcommittee on the Environment of the House Committee on Interior and Insular Affairs, 93d Cong., 2d Sess., 60 (1974) (statement of Rep. Dick Shoup of Montana). See also id., at 137 (statement of Kent Nelson, Six-County Economic Development District), 146–149 (statements of Hector Chiara and Guido Rachiele, Commissioners, Carbon County, Utah), 169–170 (statement of Dixie Leavitt, Utah State Senator). One reason this subject was under discussion was that a few years earlier, state-county rivalry had erupted over the distribution of general federal revenue-sharing funds. Representative Morris Udall, who chaired the hearings, referred to this controversy several times, asking witnesses to comment on whether payments in lieu of taxes should be distributed to the States or to local governments. See, e. g., id., at 71–72, 85–86, 146, 157. Pros and cons of both methods were aired, and various witnesses argued that state supervision was necessary to ensure that federal funds reached areas that did not themselves contain federal lands but felt the impact of their presence in neighboring counties. See id., at 17, 27–28, 85–86, 146. Thus, the decision to distribute the funds directly to the local governments was a considered one.

[13] See H. R. Rep. No. 94–1106, at 6; S. Rep. No. 94–1262, at 9.

[14] See Hearings on H. R. 9719 before the Subcommittee on Energy and the Environment of the House Committee on Interior and Insular Affairs, 94th Cong., 1st Sess., 21 (1975) (hereinafter 1975 Hearings) (statement of George Buzianis, Chairman of Tooele County Commission, Utah); id., at 29 (statement of Calvin Black, Commissioner, San Juan County, Utah); id., at

fer accidents requiring emergency services or hospitalization for which they cannot always pay;[15] commit crimes that call for police protection, prosecution, and incarceration;[16] create waste that necessitates the construction of sewage treatment plants;[17] use roads that must be paved and maintained;[18] and generally impose a strain on a county's limited resources without providing much in the way of compensating revenues. One cost unlikely to increase with the presence of this largely uninhabited federal land, however, is that of education.[19]

---

102–103 (statement of Eyer Boies, Chairman of Board of County Commissioners, Elko County, Nevada); id., at 111 (statement of James Fairfield, Mineral County Board of Commissioners); id., at 258 (remarks of Rep. Jim Santini of Nevada); id., at 298 (statement of Rep. James Oberstar of Minnesota).

[15] Id., at 33 (statement of Ivan Matheson, Chairman, County Official Association); id., at 103 (statement of Eyer Boies, Chairman of Board of County Commissioners, Elko County, Nevada); id., at 151 (submission of Bill MacDonald, District Attorney, Humboldt County, Nevada); id., at 258 (remarks of Rep. Jim Santini of Nevada).

[16] Id., at 22 (statement of George Buzianis, Chairman of Tooele County Commission, Utah) ("[P]olice protection is one main problem, vandalism, and so forth. We do not have funds to go out and police these BLM [Bureau of Land Management] lands"); id., at 151 (submission of Bill MacDonald, District Attorney, Humboldt County, Nevada) ("The vast majority of criminal cases involve transients who are passing through and decide to knock over a general mercantile, give a motel a bad check, burglarize a home or ranch, get a tank of gas and run without paying . . . etc."). In one county, the trial of a transient on a murder charge cost $25,000, "[w]ith the budget averaging $10,000 or $15,000 for this type of thing." Id., at 146 (statement of Kenneth Lee, Lincoln County Commissioner).

[17] Id., at 45 (submission of Dale Sowards, President, Colorado Counties, Inc.); id., at 298–299 (statement of Rep. James Oberstar of Minnesota).

[18] Id., at 19 (statement of George Buzianis, Chairman, Tooele County Commission, Utah); id., at 27 (statement of Calvin Black, Commissioner, San Juan County, Utah); id., at 33 (statement of Ivan Matheson, Chairman, County Official Association).

[19] See id., at 280–281 (statement of Rep. Simon) (noting need for flexibility in distribution of federal funds, since "the need in Pope County is not for the schools"). To the extent that the presence of federal lands does

Two other features of the statutory scheme shed some light on the meaning of § 6902. Another provision of the Act, 31 U. S. C. § 6904(b), provides expressly that in the case of certain additional short-term federal payments in connection with the acquisition of park or wilderness areas, the Secretary "shall distribute payments proportionally to units and school districts that lost real property taxes because of the acquisition of the interest." That Congress explicitly provided for a proportionate allocation to school districts under this provision indicates that local governments were not to be required to allocate § 6902 funds to school districts. See *Fedorenko* v. *United States*, 449 U. S. 490, 512 (1981).[20]

A subsequent amendment to the Act provides additional support for this interpretation. See *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969). In 1983, Congress amended the Act to authorize States to make limited redistributions of payments among "units of general purpose local government" within the same county. Pub. L. 98–63, 97 Stat. 324, 31 U. S. C. § 6907 (1982 ed., Supp. II).[21] This

---

increase education costs, other programs specifically provide compensation to cover those costs. See 31 U. S. C. § 6904(b); 20 U. S. C. § 236 *et seq.*

[20] The House Committee Report specifically noted that local governmental units with a single purpose, such as school districts, would not qualify to receive payments directly from the Federal Government. See n. 3, *supra.*

[21] Section 6907(a) provides:

"Notwithstanding any other provision of this chapter, a State may enact legislation which requires that any payments which would be made to units of general local government pursuant to this chapter be reallocated and redistributed in whole or part to other smaller units of general purpose government which (1) are located within the boundaries of the larger unit of general local government, (2) provide general governmental services and (3) contain entitlement lands within their boundaries. Such reallocation or redistribution shall generally reflect the level of services provided by, and the number of entitlement acres within, the smaller unit of general local government."

This amendment came in response to a ruling by the Court of Appeals for the Sixth Circuit that the Secretary of the Interior had exceeded his

amendment indicates that Congress found it necessary to provide expressly that States might reallocate funds in certain limited circumstances and that absent such express authority, States may not interfere in a county's decision-making with respect to these federal funds. The amendment also demonstrates that even when Congress determined that funds should be reallocated to smaller governmental units, it was careful to provide that those units have responsibility for "general purpose" local government. School districts and water districts, being limited to a single purpose, were thus excluded once again from direct receipt of this form of federal aid.[22]

Against this background, we have little trouble in concluding that Congress intended to prohibit the kind of state-imposed limitation on the use of in-lieu payments represented by the South Dakota statute challenged in this case.

---

authority under the Act in barring certain townships from receiving funds. *Meade Township* v. *Andrus*, 695 F. 2d 1006 (1982). The Secretary had promulgated a regulation allocating revenues to townships only if they were the "principal providers of services" on the local level. The Sixth Circuit held that this regulation conflicted with the Act's assumption that more than one unit of local government may have jurisdiction over the same entitlement lands, and with the Act's "expressed preference for *smaller* 'units of local government.'" *Id.*, at 1009. Congress amended the Act in 1983 in order to allow the Secretary to continue to make § 6902 payments directly to counties for reasons of administrative efficiency. If, however, in a particular State, the relevant governmental services are actually provided by smaller units than counties, the amendment gives the State the authority to reallocate the funds to those smaller units. See S. Rep. No. 98–141, p. 4 (1983); 129 Cong. Rec. S8444 (June 15, 1983) (statement of Sen. Durenberger).

There is no indication in the legislative history of the amendment that it was intended to cede any power or money from local governments to the State. After its passage, one of its sponsors made it clear that any cost of administering the reallocation was to be borne by the States, not the local governments. 130 Cong. Rec. E1440–E1441 (Apr. 4, 1984) (statement of Rep. Kogovsek).

[22] See n. 3 , *supra*.

## III

The School District and the State, as *amicus curiae*, argue that the South Dakota statute is a limited and therefore acceptable intrusion on a county's discretion, merely requiring it to spend in-lieu payments in the same manner as it spends tax revenues. But we are inclined to credit the county's insistence that the intrusion would not be negligible, or even modest. Absent elaborate and speculative calculations and budget juggling, the allocation of federal payments in the same proportion as local revenue would most likely result in a windfall for school districts and other entities that are already fully funded by local revenues. The federal money would not serve its intended purpose of compensating local governments for extraordinary or additional expenditures associated with federal lands. A county conceivably could avoid this result, but the strong congressional concern that local governments have maximum flexibility in this area indicates that counties should not encounter substantial interference from the State in allocating funds to the area of greatest need.

The School District and the State also argue that because of concerns of federalism, the Federal Government may not intrude lightly into the State's efforts to provide fiscal guidance to its subdivisions. The Federal Government, however, has not presumed to dictate the manner in which the counties may spend *state* in-lieu-of-tax payments.[23] Rather, it has merely imposed a condition on its disbursement of federal funds. The condition in this instance is that the counties should not be denied the discretion to spend § 6902 funds for any governmental purpose, including expenditures that are linked to federal lands within their borders. It is far from a novel proposition that pursuant to its powers under the Spending Clause, Congress may impose conditions on the

---

[23] The South Dakota statute, S. D. Codified Laws § 5–11–6 (1980), requires that both state and federal in-lieu payments be distributed in the same manner as tax revenues.

receipt of federal funds, absent some independent constitutional bar.[24]   In our view, Congress was sufficiently clear in its intention to funnel § 6902 moneys directly to local governments, so that they might spend them for governmental purposes without substantial interference.

## IV

Because existing methods of funding did not provide local governments with the funds and flexibility needed to meet the demands created by the presence of federal lands in their jurisdictions, Congress crafted a scheme designed to ensure that the funds would reach and be placed at the disposal of the affected local governments.   The attempt of the South Dakota legislation to limit the manner in which counties or other qualified local governmental units may spend federal in-lieu-of-tax payments obstructs this congressional purpose and runs afoul of the Supremacy Clause.   Congress intended the affected units of local government, such as Lawrence County, to be the managers of these funds, not merely the State's cashiers.

Accordingly, the judgment of the South Dakota Supreme Court is

*Reversed.*

JUSTICE REHNQUIST, with whom JUSTICE STEVENS joins, dissenting.

In *Hunter* v. *Pittsburgh,* 207 U. S. 161 (1907), this Court unanimously described the "settled doctrines of this Court" with respect to States, on the one hand, and counties and other municipal corporations within them, on the other:

> "Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them.   For the purpose of executing these

---

[24] See, *e. g., King* v. *Smith,* 392 U. S. 309, 333, n. 34 (1968).

powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State." *Id.*, at 178.

Flying in the face of this settled doctrine, the Court today holds that Congress, by providing for payments of federal funds in lieu of taxes to counties in South Dakota, implicitly prohibited the State of South Dakota from regulating in any way the manner in which its counties might spend those funds. Recognizing that the statutory language does not support such a result, the Court seeks to glean from bits and pieces of the testimony of witnesses before congressional Committees, and from selected statements in Committee Reports which do not address the question here at issue, ammunition for the result it reaches. I do not think the Court's opinion succeeds in this rather formidable task.

The statute in question, 31 U. S. C. § 6902(a), provides:

> "The Secretary of the Interior shall make a payment for each fiscal year to each unit of general local government in which entitlement land is located. A unit may use the payment for any governmental purpose."

Surely the normal reading of this language would be that appellant Lawrence County is entitled to receive a payment each year from the Secretary of the Interior, and that it may use this payment for any purpose lawful under the system of laws that regulates its activities. The statutes of South Dakota constitute the system of laws regulating Lawrence County. They require in this case that all "in-lieu payments" received by the county, whether from the State or the Federal Government, shall be distributed by the county "in the same manner as taxes are distributed." S. D. Codified Laws § 5–11–6 (1980). In Lawrence County this would mean that appellee Lead-Deadwood School District would

receive 60% of the payment. The Court's opinion, however, says the State may not impose such a neutral requirement on the county's disposition of the federal in-lieu payments. The opinion is necessarily premised on the assumption that the words "governmental purpose" in the federal statute somehow emancipate the county from the state regimen as to what is and is not a proper governmental purpose for a county. The Court apparently creates a new federal definition of "governmental purpose," the confines of which are left wholly undeveloped.

The Court relies upon the "administrative construction" of the Act as a primary reason for reaching the result that it does. But the vaunted "administrative construction" simply restates the statutory language in the form of a regulation, 43 CFR § 1881.2 (1983), without any explanatory language. The Court says that "[t]he department has consistently interpreted the statute as foreclosing limitations on the use of in-lieu funds" and cites to a reference in the brief of the United States in this case. *Ante*, at 261. But the part of the brief cited by the Court refers to a regulation prohibiting school districts from receiving funds directly, and to the above-quoted language simply repeating the words of the statute. Neither of the regulations relied upon supports the Court's bland statement that administrative regulations have foreclosed limitations by the State on the counties' use of in-lieu funds.

Other legislative materials upon which the Court relies are similarly inapt or ambiguous. The conclusion of the House Committee, for example, H. R. Rep. No. 94–1106, p. 12 (1976), that "these new payments should [not] be restricted or earmarked for use for specific purposes" does not by its terms, or fairly interpreted, prohibit States from having any say in the way counties may spend federal in-lieu payments. This statement could just as fairly be interpreted as indicating an intention on the part of Congress not to restrict or earmark such in-lieu funds for a particular purpose.

This two-sentence statutory provision enacted by Congress certainly does not proclaim by its language any single meaning, but one would be hard pressed to derive a more tortured meaning from it than that chosen by the Court. It may be that Congress, by providing that payments be made directly to the counties rather than to the States, implied a desire to have the money spent in the counties. But nothing in the South Dakota statute requires any contrary result; all the South Dakota statute requires is that the counties allocate a part of the money to school districts within the county, just as general tax revenues and state in-lieu payments are allocated. The Court's collection of reasons why Congress intended to prohibit this result is simply not convincing in the light of the long history of treatment of counties as being by law totally subordinate to the States which have created them. I would therefore affirm the judgment of the Supreme Court of South Dakota.