**CITY & COUNTY OF SAN FRANCISCO, et al.,
Plaintiffs,**

v.

**SAN FRANCISCO POLICE OFFICERS ASSOCIATION, et al., Defendants.**

No. C–84–4045 RFP.

United States District Court,
N.D. California.

March 14, 1985.

* Nor further action appears to have been taken thereon.

Michael C. Killelea, Deputy City Atty., San Francisco, Cal., for City & County of San Francisco.

Lois Salisbury, James R. Wheaton, Public Advocates, Inc., San Francisco, Cal., for intervenors, Officers for Justice.

Joel Nomkin, Gerald George, Dept. of Justice, Washington, D.C., for U.S., amicus curiae.

Ralph B. Saltsman, Soloman, Saltsman & Hart, Marina Del Rey, Cal., for defendants.

## MEMORANDUM

PECKHAM, Chief Judge.

### INTRODUCTION

On February 28, 1985, this court heard oral argument on the issue of whether the Supremacy Clause, and the provisions of the Consent Decree and Title VII, authorized the Civil Service Commission (CSC) to violate Civil Service rule 5.07, when faced with the adverse impact resulting from the promotional examinations. The court granted partial summary judgment on this issue in favor of the City and County of San Francisco (the City) and the CSC. The court in this Memorandum sets forth the reasons for its order granting partial summary judgment.

The facts pertaining to the issue discussed below were set forth in detail in the court's Memorandum and Order of December 31, 1984, which held that the removal of this case was proper and preliminarily enjoined the City from using the revised weighting system for the Q/50 and Q/35 examinations. Therefore, the court does not find it necessary to restate the facts in this Memorandum.

### LEGAL ANALYSIS

Civil Service rule 5.07 prohibits the CSC from reconsidering matters previously decided by it more than 30 days after notice of the decision of the original vote. The POA, therefore, claims that the CSC did not have the power to change the weights in the manner in which it did—by a reconsideration vote taken on an issue which had been decided and closed eight months earlier. The POA contends that, if the September 12 weights were invalid, the CSC should have explicitly passed an exception rule to cover this one matter or promulgated a new rule covering examinations which are given to effectuate federal Consent Decrees.

In *Smith v. City and County of San Francisco*, 11 Cal.App.3d 606, 89 Cal.Rptr. 878 (1st Dist.1970), a licensed vocational nurse appealed her discharge from her position to the CSC. The Commission affirmed the discharge. In affirming the trial court's decision denying her petition for a writ of mandate to compel the Commission to reopen her appeal, the court of appeal stated that "[b]y its order, the jurisdiction of the commission over the matter ceased, and it may not of its own volition reopen the matter." *Id.* at 610, 89 Cal. Rptr. at 879.

The POA maintains that *Smith* bars the CSC from reopening or revoting a matter of its own volition. Therefore, once the CSC's September 12, 1983 vote became final, the CSC lost jurisdiction over the weighting of the exam components.

The City formulates the issues in the case somewhat differently. According to it, the central issues are whether the Q/50 and Q/35 examinations were valid under federal law and whether the parties were obligated to assure compliance with the promotional goals of the Consent Decree. The City easily distinguishes *Smith* because conflicting provisions of federal law and state law were not involved in that case. The City's decision to reweight the exams was a result of the perceived violation of the commands of Title VII and the Consent Decree. This perceived violation invokes the Supremacy Clause.

The Supremacy Clause provides that "[t]his Constitution and the Laws of the United States which shall be made in

Pursuance thereof ... shall be the Supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Constitution, Art. VI, cl. 2. Thus, a state law which conflicts with federal law or "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress" is void under the Supremacy Clause. *Lawrence County v. Lead-Deadwood School District*, —— U.S. ——, 105 S.Ct. 695, 698 (1985).

In *United States v. City of Chicago*, 549 F.2d 415, 438 (7th Cir.), *cert. denied* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), the court recognized that the application of Illinois Municipal Code provisions had to be suspended under the Supremacy Clause to the extent that the provisions violated the command of Title VII. The Seventh Circuit then warned the district court that, despite the conflict of state law with federal civil rights legislation, the district court did not have an unbridled license to replace the state's method for selecting police officers with its own. "When a state statute is assailed because of alleged conflict with a federal law, the same considerations of forbearance, the same regard for the lawmaking power of States, should guide the judicial judgment as when this Court is asked to declare a statute unconstitutional outright." *Id., quoting Farmers Union v. WDAY, Inc.*, 360 U.S. 525, 546, 79 S.Ct. 1302, 1314, 3 L.Ed.2d 1407 (1959) (Frankfurter, J. dissenting).

The court in *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914, 918 (6th Cir.1979), was faced with a civil service rule that conflicted with the stated goal of a consent decree. The goal of the decree was to attract sufficient numbers of minority applicants to the Toledo police force so that within five years the ratio of minorities within the force would reasonably reflect the ratio of each minority group to the total population of the city. The Division of Police had traditionally followed a "rule of three" which required the civil service commission to certify the names of the three candidates standing highest on the eligibility list for each position to be filled.

The appointments were then made from the group of three. The district court suspended the rule of three and directed the city defendants to certify for appointment the names of all black applicants who had passed the last examination, without regard to their positions on the eligibility list. The district court stated that the only effect of its order was to suspend the civil service rule to the extent it impeded the operation of the consent decree. The Sixth Circuit, in affirming, construed the order as merely expanding the eligibility list. The additional eligible applicants did not replace or "bump" an otherwise eligible white applicant. *Id.* at 919.

■ Pursuant to the Supremacy Clause, it appears that this court also could have suspended application of civil service rule 5.07 to the extent it impeded the operation of the Consent Decree. The Consent Decree states that:

[t]he city shall ... make no further use of tests or other selection qualifications, standards or procedures for hiring or promotion within the San Francisco Police Department ... which have a disproportionately adverse impact against minorities or females, unless and until such standards have been shown to be valid, pursuant to the *Uniform Guidelines on Employee Selection Procedures*, 43 Fed. Reg. 38290, August 25, 1978, or any superseding federal guidelines.

Consent Decree at ¶ 4. The Consent Decree specifically forbids the City from using the tests or other selection qualifications which demonstrated adverse impact "unless and until" they have been shown to be valid. The City believed that the examinations as weighted were invalid. Therefore, if it continued to use them, it would be in direct violation of the Consent Decree.

■ Both *City of Chicago* and *Sarabia* concerned the authority of the district court to suspend the application of state or local law. In the case at hand, the City itself, when faced with the conflict between state law and the goals of the Consent

Decree, voluntarily suspended the application of civil service rule 5.07. The courts generally favor voluntary compliance on the part of an employer faced with a prima facie showing of adverse impact as the "preferred means" of eliminating employment discrimination. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017–18, 39 L.Ed.2d 147 (1974); *Bushey v. New York State Civil Service Commission*, 733 F.2d 220, 228 (2d Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 803, 83 L.Ed.2d 795 (January 8, 1985). The court must explore whether the City had the right to violate a civil service rule in taking steps to eliminate voluntarily the adverse impact resulting from the Q/50 and Q/35 examinations.

That issue was summarily dealt with by the Second Circuit in *Kirkland v. New York State Dep't of Correctional Services,* 711 F.2d 1117 (2d Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984). In *Kirkland,* minority Corrections Sergeants in the New York State Department of Correctional Services brought a class action alleging that promotional examinations' resulting eligibility lists were racially discriminatory in violation of Title VII. The district court approved the parties' settlement, and the intervenors challenged the district court's order of approval. The intervenors contended that the proposed settlement violated both the New York Constitution and the state civil service law by departing from the principle that promotions in the state civil service were to be made by competitive examination. *See* 552 F.Supp. 667, 675 (S.D.N.Y. 1982). The Second Circuit refused to even consider these objections, stating that "[b]ecause state law must yield to federal law in Title VII cases (citations omitted), we need not consider whether the settlement agreement violates state law." 711 F.2d at 1132 n. 18.

The Second Circuit again emphasized Title VII's preference for voluntary compliance in *Bushey v. New York State Civil Service Commission*, 733 F.2d 220 (2d Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985). There, the

court held that a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for employer-initiated voluntary race-conscious remedies. The dispute in *Bushey* centered on promotional examinations for the position of Correction Captain in New York's Correctional Services. After administering the test, the Civil Service tabulated each candidates' right and wrong answers to arrive at the candidates' raw scores. The tabulation results indicated that the passing rate of minority candidates was approximately fifty percent lower than the passing rate of nonminority candidates. Under the 80 percent rule, the State determined that the Captains' exam had an adverse racial impact. The State then adjusted both the minority and nonminority candidates' scores by converting them to separate frequency distributions and then equating or normalizing them with the respective means. The effect was to increase to fifty percent the percentage of minorities who passed the test. In practical terms, the adjustment added eight minority candidates to the eligibility list without removing any of the 119 nonminorities from the list.

By acting to eliminate the perceived adverse impact of the examination on minorities, the State anticipatorily sought to avoid litigation it assumed minority candidates would bring. The nonminorities, however, brought suit, contending that the State's adjustment of candidates' raw scores involved "reverse discrimination" in violation of Title VII. The nonminorities challenged the adjustment of test scores which occured without a prior judicial finding that the test was not valid.

The Second Circuit, in reversing the trial court, held that a prima facie showing of adverse impact in a selection process creates a sufficiently serious claim of discrimination so as to permit an employer to take voluntary remedial measures to eliminate that impact. *Id.* at 228. The court further held that a judicial determination that the

prima facie case was not rebuttable through job-related explanations is neither required nor appropriate. *Id.* at 226.

The court reasoned that Title VII's preference for voluntary compliance would be seriously undermined if an employer were required to postpone settling a Title VII testing case pending a judicial determination of the test's validity. *Id.* at 227.

The Second Circuit's decisions make clear that there is a strong preference for voluntary compliance as the means of eliminating employment discrimination. Civil service rule 5.07 stood as an obstacle to the accomplishment of the objectives of Title VII. This court certainly had the right to order the CSC to reconsider its initial vote. Given the preference for voluntarily compliance with Title VII, the City also had the right to suspend temporarily the application of Civil Service rule 5.07 when it was faced with supposedly-invalid promotional examinations demonstrating adverse impact. Thus, under the Supremacy Clause, the civil service rule had to give way to the extent it impeded operation of the Consent Decree.

The court therefore granted partial summary judgment in favor of the City and County of San Francisco and the Civil Service Commission.