**Audra BEASLEY, individually and on behalf of all other similarly situated, Plaintiff,**

v.

**ALABAMA STATE UNIVERSITY, et al., Defendants.**

**No. CIV. A. 96–T–473–N.**

United States District Court, M.D. Alabama, Northern Division.

March 23, 1998.

Opinion Supplementing Decision April 27, 1998.

Joseph (Jay) Brady Lewis, Terry R. Smyly, Law Offices of Jay Lewis, Montgomery, AL, J. Bernard Brannan, Jr., Brannan & Guy, Montgomery, AL, John R. Moore, Isabelle Katz Pinzler, United States Department of Justice, Civil Rights Division Educational Opportunities Section, Kathryn Woodruff, United States Department of Justice, Civil Rights Division, Washington, DC, for Audra Beasley, individually, and on behalf of all other similarly situated; United States of America, plaintiffs.

Solomon S. Seay, Jr., Montgomery, AL, Cynthia Williams Clinton, Mark Englehart, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, for Defendants.

## ORDER

MYRON H. THOMPSON, Chief Judge.

The issue presented to the court is whether a claim brought against a state university based on Title IX of the Education Amendments of 1972, 20 U.S.C.A. §§ 1681 through 1688 (West 1990), and its implementing regulations, 34 C.F.R. §§ 106.38, 106.41 (1997), is barred by the eleventh amendment to the United States Constitution.

## I. BACKGROUND

Plaintiff Audra Beasley, a female student and former athlete at defendant Alabama State University (ASU), filed this lawsuit on March 15, 1996, claiming that ASU, through its trustees and various officers, was in violation of Title IX and its implementing regulations, as well as the equal protection clause of the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983 (West 1994). By orders entered March 27 and June 9, 1997, this court dismissed a number of claims and defendants, ruling that ASU may be sued under Title IX, and that other individually-named, current officers of ASU may be sued in their official capacities for injunctive relief under Title IX and the fourteenth amendment. *Beasley v. Alabama State Univ.*, 966 F.Supp. 1117 (M.D.Ala.1997) (Thompson, J.).

On August 7, 1997, the defendants filed a motion for summary judgment as to all remaining claims in the case. In addition to their contention that summary judgment should be granted as to these claims on their merits, the defendants asserted that all Title IX claims against ASU and any remaining monetary claims against the individual defendants under Title IX are barred by the immunity granted by the eleventh amendment

to the United States Constitution. On September 15, 1997, the court notified the Attorney General of the United States, pursuant to 28 U.S.C.A. § 2403(a) (West 1994) and Federal Rule of Civil Procedure 24(c) (West 1997), of this challenge to the constitutionality of Title IX, and on October 28, 1997, the United States filed a complaint-in-intervention in this action to defend the constitutionality of Title IX.

By order entered October 28, 1997, the court denied the defendants' motion for summary judgment as premature to the extent that the defendants sought adjudication on the merits of Beasley's claims. However, the court stated that it would rule on the legal issues raised by the defendants' contention that Beasley's Title IX claims are barred by the eleventh amendment.

In this order, the court addresses these legal issues, and holds that, because ASU voluntarily waived any eleventh amendment immunity it enjoyed against this lawsuit when it accepted federal funds for education in the face of Title IX's clear statement that such a waiver would occur, this court may exercise jurisdiction over Beasley's Title IX claims.

## II. DISCUSSION

The defendants contend that they are entitled to summary judgment on all of Beasley's claims brought pursuant to Title IX because such claims are barred by the eleventh amendment, which provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Eleventh amendment sovereign immunity has been held to apply to suits brought by citizens against their own state, and is likewise applicable to cases in which the court's jurisdiction is grounded on the existence of a federal question. See Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, ——, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997); Blatchford v. Native Village of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991). Here, it is undisputed that Beasley is a citizen of Alabama and that ASU is an instrumentality of the state that is entitled to Alabama's sovereign immunity. See Harden v. Adams, 760 F.2d 1158 (11th Cir.1985) (holding that state universities are agencies or instrumentalities of the state for purposes of eleventh amendment immunity); Davis v. Alabama State Univ., 613 F.Supp. 134, 139–40 (M.D.Ala.1985) (Thompson, J.) (holding that the eleventh amendment prohibits federal courts from entertaining suits against ASU and its board of trustees, as well as suits for damages against the president of ASU in his official capacity). Thus, as a general proposition, the eleventh amendment bars all of Beasley's claims against ASU, regardless of the relief she seeks. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) ("[A] suit in which the State or one of its agencies or departments is named as defendant is proscribed by the Eleventh Amendment.... This jurisdictional bar applies regardless of the nature of the relief sought.").

By contrast, the eleventh amendment exerts a different effect on the individual defendants who remain in this case. Specifically, to the extent Beasley seeks prospective injunctive relief against the individual defendants in their official capacities, the eleventh amendment presents no bar to her claims, under the exception first articulated in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), for actions seeking declaratory and injunctive relief against state officials for alleged violations of federal law. However, the eleventh amendment does preclude Beasley from obtaining monetary damages from the individual defendants in their official capacities. See Kentucky v. Graham, 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985) ("[T]he Eleventh Amendment bars a damages action against a State in federal court.... This bar remains in effect when State officials are sued for damages in their official capacity."). Accordingly, at issue in the present motion is whether Beasley may bring any claims for relief against ASU, and whether she may bring claims for monetary damages against the individual defendants in their official capacities. This analysis, however, does not bear

upon her ability to sue the individual defendants for injunctive relief. Therefore, when the court alludes generically to Beasley's Title IX claims in this order it refers to all of her claims against AS.U, and to her claims for monetary relief against the individual defendants in their official capacities.

The main thrust of the defendants' eleventh amendment argument is that the court may not exercise jurisdiction over Beasley's surviving claims because Congress has failed to abrogate effectively Alabama's, and hence ASU's, eleventh amendment immunity for claims brought pursuant to Title IX. The United States Attorney General counters by asserting that the defendants misread and misapply the pertinent case law, and that Congress has indeed validly abrogated states' immunity in Title IX, as amended by the Rehabilitation Act Amendments of 1986, Pub.L. No. 99–506, Tit. I, § 1003, 100 Stat. 1845 (1986). This dispute is fueled by the parties' contradictory readings of an important recent Supreme Court decision, *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), with additional heat provided by their inconsistent interpretations of Title IX's so-called 'abrogation provision,' 42 U.S.C.A. § 2000d–7 (West 1994).

In taking this abrogation and *Seminole Tribe*-centered approach to the eleventh amendment issue, the parties adhere to a mode of analysis that has been adopted by other courts that have addressed this issue in the Title IX context. *See, e.g., Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir.1997); *Franks v. Kentucky Sch. for the Deaf*, 956 F.Supp. 741, 749–51 (E.D.Ky.1996), *appeal pending*, No. 97–5075 (6th Cir.). As explained more fully below, however, this court concludes that the particular nature of Title IX, specifically the fact that it is a spending clause enactment and therefore does not thrust abrogation upon potentially unwilling states, but rather conditions the receipt of federal funds for education upon the states' *voluntary* waiver of sovereign immunity, renders the parties' approach inapt. Instead, as the United States Attorney General argues in the alternative, the appropriate approach to the issue involves an assessment of whether Congress may constitutionally condition

the receipt of education funds by states on such a waiver, and, if so, whether it provided the states with sufficient notice that their acceptance of federal education funds would result in the waiver of their eleventh amendment immunity for private damages actions brought pursuant to Title IX. The focal point of this analysis is not *Seminole Tribe*, but rather the Supreme Court's decisions in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) and *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), as well as other decisions interpreting the scope of Congress's spending clause power.

In the following discussion, the court will first briefly discuss the abrogation-based approach to the eleventh amendment issue, and explain why it does not hold sway in the Title IX context. Next, the court will ascertain whether Congress may constitutionally, pursuant to its spending power, condition the receipt of federal funds on states' waiver of their eleventh amendment immunity. Finally, the court will determine whether Congress is obligated to comply and, if so, has complied, with the stringent notice requirements for the valid exercise of such power, specifically with respect to private claims for damages under Title IX. As explained below, the court concludes that Congress may constitutionally condition federal funding on states' waiver of immunity, and that it has validly done so with respect to private damages actions, like those brought by Beasley, under Title IX.

### A. Applicability of the *Seminole Tribe* Test to Title IX

■ As a threshold matter, because much of the following analysis depends upon it, the court must briefly discuss the source of congressional power underlying Title IX. Although the United States Supreme Court has declined to reach this question, *see Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 n. 8, 112 S.Ct. 1028, 1038 n. 8, 117 L.Ed.2d 208 (1992), the Eleventh Circuit Court of Appeals has concluded that Title IX was enacted pursuant to Congress's spending clause power. *See Davis v. Monroe County Bd. of Educ.*, 120 F.3d 1390, 1397–99 (11th Cir.1997) (en banc), *petition for cert. filed*, 66

U.S.L.W. 3387 (U.S. Nov. 19, 1997) (No. 94–9121). In *Davis*, the en banc court held that Title IX does not create a cause of action against public school boards or officials for failure to prevent or remedy student-on-student sexual harassment. Although it was not specifically confronted with the question presented here, namely whether states' eleventh amendment immunity bars claims brought against them pursuant to Title IX, the *Davis* court did conclude, in the course of determining the scope of protection afforded by Title IX, that the statute was enacted pursuant to the spending clause alone, and not pursuant to § 5 of the fourteenth amendment. 120 F.3d at 1397–99. Thus, for purposes of resolving the issue presented here, the court will proceed on the assumption that Title IX is spending clause legislation.[1]

■ As stated, the primary issue raised by the defendants' eleventh amendment argument, as framed by the parties, is whether Congress effected a valid abrogation of the eleventh amendment for the type of Title IX claims that Beasley alleges in this action. This approach is consonant with that taken by courts that have been confronted by congressional enactments purporting to abolish, unilaterally, states' sovereign immunity against certain legal claims. *See, e.g., College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 131 F.3d 353,

357–361 (3d Cir.1997); *Close v. New York*, 125 F.3d 31, 36–38 (2d Cir.1997). As the United States Supreme Court recently emphasized in *Seminole Tribe*, a two-pronged inquiry must be undertaken to decide whether such a unilateral abrogation is valid. First, the court must ascertain whether Congress unequivocally expressed its intent to abrogate eleventh amendment immunity for the actions in question. *See Seminole Tribe*, 116 S.Ct. at 1123. If such an unequivocal expression of intent is found, the court must next determine whether Congress acted pursuant to a valid exercise of power when it sought to abrogate the immunity. *See id.*

In their briefs, the parties devote substantial space to a debate over whether Congress satisfied the two-prong *Seminole Tribe* test in enacting Title IX. Of critical importance to this dispute is the question of whether Title IX was enacted solely pursuant to the spending clause, or whether Congress also drew upon its power under § 5 of the fourteenth amendment when it enacted the legislation. This question plays a pivotal role in the analysis, as the parties perceive it, because, in the wake of *Seminole Tribe*, § 5 of the fourteenth amendment stands as the sole source of constitutional authority that permits Congress to abrogate eleventh amendment immunity.[2] Thus, according to the par-

---

1. In addition to the observation that the Eleventh Circuit in *Davis* did not specifically address the congressional power underlying Title IX in the context of an eleventh amendment defense, this court also notes that other courts disagree with the Eleventh Circuit's conclusion that Title IX is spending clause legislation alone, and was not also *enacted pursuant to* § 5 of the fourteenth amendment. *See, e.g., Doe v. University of Ill.*, 138 F.3d 653, 655–59 (7th Cir. Cir.1998) (holding that Title IX was enacted pursuant to both § 5 of the fourteenth amendment and the spending power); *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir.1997) (holding that Title IX was enacted pursuant to § 5 of the fourteenth amendment); *Franks v. Kentucky Sch. for the Deaf*, 956 F.Supp. 741, 749–51 (E.D.Ky.1996) (same); *appeal pending*, No. 97–5075 (6th Cir.).

 Moreover, it should be noted that the Supreme Court has granted certiorari in a case addressing the correct legal standard for determining when a school district may be held liable for damages under Title IX to a student who was sexually harassed by one of the district's teachers. *See Doe v. Lago Vista Independent School District*, 106 F.3d 1223 (5th Cir.), *cert. granted sub nom.*

*Gebser v. Lago Vista Independent School District*, —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997). In resolving this question, the Court may be called upon to determine the source of congressional power underlying Title IX. *See* Brief for Respondent, *Gebser*, 1998 WL 63153, at *18–35 (arguing that Title IX is spending clause legislation, thus limiting the scope of potential standards for liability under the statute); Brief for the United States as Amicus Curiae, *Gebser*, 1998 WL 24199, at *23 n. 16 (arguing that Title IX was enacted pursuant to § 5 of the fourteenth amendment).

2. In *Seminole Tribe*, the Supreme Court noted that its prior decisions had recognized only two provisions of the Constitution as authorizing Congress to. abrogate eleventh amendment immunity, namely § 5 of the fourteenth amendment, and the interstate commerce clause. However, the Court in *Seminole Tribe* expressly overruled *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), the decision that had established that the latter provision could be invoked to waive state sovereign

ties' approach to the issue, only if Title IX is found to have been promulgated under § 5 of the fourteenth amendment could Congress have validly abrogated states' eleventh amendment immunity for Title IX actions.

However, the court will not reach the question of whether Title IX was enacted pursuant to § 5 of the fourteenth amendment as well as the spending clause, because, as explained above, the Eleventh Circuit held in *Davis* that Title IX is spending clause legislation. And on that basis, the court further concludes that the *Seminole Tribe* test should not be applied in the Title IX context.

■ Though the *Seminole Tribe* test is unquestionably appropriate where the legislation purporting to abrogate states' immunity is passed pursuant to most sources of congressional power, it is misplaced where Congress has wielded its spending power to enact legislation that may affect states' constitutional immunity. The reason, simply stated, is that spending clause legislation is fundamentally different from laws passed pursuant to the other sources of congressional power. Specifically, in a spending clause enactment Congress does not attempt to impose unilaterally a condition upon the states, but instead wields the 'power of the purse' to regulate indirectly states' conduct by conditioning the receipt of federal funds on states' compliance with particular conditions. *See Pennhurst*, 451 U.S. at 17, 101 S.Ct. at 1540 (noting that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions"); *see also Lawrence County v. Lead–Deadwood School Dist.*, 469 U.S. 256, 269–270, 105 S.Ct. 695, 702–03, 83 L.Ed.2d 635 (1985) ("It is far from a novel proposition that pursuant to its powers under the Spending Clause, Congress may impose conditions on the receipt of federal funds, absent some independent constitutional bar."). Consequently, when Congress exercises its spending power, it does not compel states' compliance by legislative fiat, but rather extends an offer of funds to the states

in exchange for their agreement to comply with certain enumerated conditions. Thus, where the spending power is involved, states are given a choice as to whether they wish to adhere to certain terms or relinquish certain rights in exchange for federal funds.

In view of this nature of spending clause legislation, the parties' focus on the validity of Congress's 'abrogation' of states' eleventh amendment immunity in Title IX is wholly misplaced. Title IX, because it is a spending clause enactment, does not purport to 'abrogate'—that is, unilaterally abolish—anything, including the states' immunity, but rather reflects Congress's intent to condition the receipt of federal funds for education on states' *voluntary* waiver of their immunity.

Thus, because no 'abrogation' is involved in the Title IX context, the *Seminole Tribe* test is inapplicable here. The Supreme Court defined the principal issue presented in *Seminole Tribe* as follows: "whether Congress has the power to abrogate *unilaterally* the States' immunity from suit." 116 S.Ct. at 1125 (emphasis added). This inquiry, as the Court explained, was narrowed to the following question: "Was the Act in question passed pursuant to a constitutional provision granting Congress the power to *abrogate?* " *Id.* (emphasis added). Thus, the unmistakable focus of the Court's analysis in *Seminole Tribe*, at least with respect to the second prong of the test articulated in that decision, was the constitutionality of Congress's attempt to abolish unilaterally states' sovereign immunity in the legislation at issue. The court did not address, because it was irrelevant to its inquiry, the power of Congress to condition the receipt of federal funds on a voluntary waiver of states' sovereign immunity pursuant to the spending clause. This last point will be further examined below, when the court returns to the *Seminole Tribe* decision to ascertain how the Supreme Court's broader pronouncements concerning the balance between state and federal power achieved by Article III and the eleventh amendment affect the outcome of the instant dispute. But for present purposes, it is suffi-

---

immunity. 116 S.Ct. at 1125–28. This left only the fourteenth amendment as a still-viable fount

of authority for congressional abrogation.

cient to note that a careful reading of *Seminole Tribe* establishes that the two-prong test is applicable only where, unlike in the Title IX context, Congress has attempted to unilaterally impose abrogation upon the states.

### B. May Congress Condition Federal Funds on States' Waiver of Eleventh Amendment Immunity?

■ Having concluded that the defendants' eleventh amendment argument does not implicate *Seminole Tribe*'s two-prong test because Title IX does not purport to abrogate unilaterally states' sovereign immunity, the court turns next to the United States Attorney General's alternative argument that Alabama, and hence ASU, waived its sovereign immunity by accepting federal education funds conditioned upon such a waiver.[3] In addressing this argument, the court will be called upon to decide whether Congress may constitutionally, pursuant to its spending power, condition the receipt of federal funds on states' waiver of their eleventh amendment immunity.

The United States Attorney General's argument may be summarized as follows. She contends that Congress, in promulgating Title IX pursuant to the spending power, placed particular conditions upon states seeking federal funds for educational purposes. According to the Attorney General, waiver of state sovereign immunity against Title IX lawsuits is one of these conditions unambiguously set forth in the legislation, specifically in § 2000d–7, the so-called 'abrogation provision' that was introduced by the Rehabilitation Act Amendments of 1986, Pub.L. No. 99–506, Tit. I, § 1003, 100 Stat. 1845 (1986). Thus, the United States Attorney General argues, Alabama has waived its immunity to Title IX suits by accepting funds for education after the enactment of that clear provision.

The United States Attorney General further asserts that Congress's ability to so condition the acceptance of federal funds was recognized by the Supreme Court in *Atascadero, Petty v. Tennessee–Missouri Bridge*

*Comm'n*, 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959), and numerous other decisions. Moreover, according to the Attorney General, this principle was left undisturbed by the Court's subsequent decision in *Seminole Tribe*.

The court finds that this argument has merit and supports a conclusion that it may exercise jurisdiction over Beasley's Title IX claims. As a threshold matter, the court agrees that § 2000d–7 contains a clear expression of congressional intent to condition the receipt of federal funds under Title IX on states' waiver of eleventh amendment immunity. Subpart (a)(1) of this provision reads, in pertinent part, as follows:

> "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... title IX of the Education Amendments of 1972 [20 U.S.C.A. § 1681 et seq.]...."

42 U.S.C.A. § 2000d–7(a)(1) (West 1994). Subpart (a)(2) then provides:

> "In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State."

42 U.S.C.A. § 2000d–7(a)(2) (West 1994). There is no question that § 2000d–7 expresses in unambiguous terms that states' sovereign immunity does not protect them against lawsuits stemming from violations of Title IX. *Cf. Clark v. California*, 123 F.3d 1267, 1271 (9th Cir.1997) (finding that, with respect to the Rehabilitation Act, § 2000d–7 "manifests a clear intent to condition a state's participation on its consent to waive its Eleventh Amendment immunity")...

■ Furthermore, as discussed above, the United States Attorney General is on solid ground in asserting that pursuant to the spending clause Congress may condition the receipt of federal funds on states' compliance

---

**3.** In her complaint, Beasley alleges that since the passage of Title IX, ASU has received and continues to receive federal funding for its educational

programs, including funds for grants and direct student financial aid. Complaint at ¶ 7. The defendants do not dispute these allegations.

with particular requirements. *See Atascadero*, 473 U.S. at 238 n. 1, 247, 105 S.Ct. at 3145 n. 1, 3149–50 (noting that "A State may effectuate a waiver of its constitutional immunity by ... waiving its immunity to suit in the context of a particular federal program," and strongly implying that a waiver will be valid where a statute "manifest[s] a clear intent to condition participation in the programs funded under the [statute] on a State's consent to waive its constitutional immunity"); *Pennhurst*, 451 U.S. at 17, 101 S.Ct. at 1540 (noting that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions"); *Lawrence County v. Lead–Deadwood School Dist.*, 469 U.S. 256, 269–270, 105 S.Ct. 695, 702–03, 83 L.Ed.2d 635 (1985) ("It is far from a novel proposition that pursuant to its powers under the Spending Clause, Congress may impose conditions on the receipt of federal funds, absent some independent constitutional bar."). The United States Attorney General is also correct to observe that the Supreme Court has long recognized that states may voluntarily waive eleventh amendment immunity and thereby subject themselves to suits in federal courts. *See Seminole Tribe*, 116 S.Ct. at 1128 (acknowledging "the unremarkable, and completely unrelated, proposition that the States may waive their sovereign immunity"); *Petty v. Tennessee–Missouri Bridge Comm'n*, 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959). The specific question raised by the United States Attorney General's argument, however, is whether, in accordance with the foregoing principles, waiver of sovereign immunity is one of the conditions that Congress may constitutionally place on states' receipt of federal funds pursuant to the spending power. Resolution of this question, as will be seen, requires the court to examine the extent to which principles of federalism, as embodied in the eleventh amendment, constrain Congress's ability to demand that states relinquish certain sovereign rights as a condition of receiving federal funds pursuant to the spending power.

As noted above, the United States Attorney General's argument relies in part upon the Supreme Court's decision in *Atascadero*, where the Court remarked that states may waive their eleventh amendment immunity "in the context of a particular federal program." 473 U.S. at 238 n. 1, 105 S.Ct. at 3145 n. 1. The *Atascadero* Court went on to hold, however, that the legislation at issue in that decision, the Rehabilitation Act as it stood in 1985, fell "far short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity," and that, consequently, were the Court to view the Act as spending clause legislation, it "would hold that there was no indication that the State of California consented to federal jurisdiction." *Id.* at 247, 105 S.Ct. at 3149–50. These statements, the United States Attorney General urges, strongly imply that Congress may indeed condition grants of federal funds on states' waiver of eleventh amendment immunity, provided the statute at issue manifests Congress's 'clear intent' to condition participation in the relevant programs on states' consent to effect such a waiver.

The court agrees that these implications may properly be drawn from the Supreme Court's statements in *Atascadero*. Moreover, the court finds further support for the notion that Congress may condition the provision of federal funds on a waiver of constitutional immunity without contravening settled principles of federalism in other Supreme Court decisions holding that Congress may wield its spending power to achieve 'indirectly' objectives that it is not empowered under the constitution to achieve directly.

The Supreme Court's clearest, and most expansive, expression of this concept was set forth in *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), where the Court was confronted with South Dakota's challenge to a Congressional statute that reduced federal funding of state highway construction for states whose legal drinking age was lower than 21 years. The state argued, based upon its contention that the twenty-first amendment precludes Congress from *directly* regulating states' drinking ages, that Congress was forbidden to under-

mine that prohibition by employing its spending power to, in effect, *indirectly* regulate drinking ages. The Supreme Court rejected this argument, explaining that in a previous decision, *United States v. Butler*, 297 U.S. 1, 66, 56 S.Ct. 312, 319, 80 L.Ed. 477 (1936), "the Court, resolving a longstanding debate over the scope of the Spending Clause, determined that the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution. Thus, objectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *Dole*, 483 U.S. at 207, 107 S.Ct. at 2796 (internal quotation marks and citations omitted). Hence, the Court concluded, "the constitutional limitations on Congress when exercising its spending power are less exacting than those on its authority to regulate directly." *Id.* at 209, 107 S.Ct. at 2797. The *Dole* Court also noted that its conclusion was reinforced by the Court's prior holding, in *Oklahoma v. Civil Serv. Comm'n*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), that a perceived limitation of a different constitutional amendment, the tenth amendment, on congressional regulation of state affairs does not concomitantly limit the range of conditions legitimately placed on federal grants. *Dole*, 483 U.S. at 210, 107 S.Ct. at 2797.

In view of this Supreme Court precedent, the United States Attorney General asserts that the limitations on congressional power embodied in the eleventh amendment, like those in the tenth amendment (at issue in *Oklahoma v. Civil Serv. Comm'n*) and the twenty-first amendment (at issue in *Dole*), do not circumscribe the range of conditions that may be placed on grants of federal funds. Stated differently, the United States Attorney General's position is that even if the eleventh amendment, as interpreted and applied by the Court in *Seminole Tribe*, forbids Congress directly to empower citizens to sue state actors pursuant to Title IX, Congress may nonetheless evade this constraint imposed by the eleventh amendment by conditioning a state actor's acceptance and use of federal funds on its agreement to waive eleventh amendment immunity.

The argument proffered by the United States Attorney General certainly is a cogent one. However, it is incumbent upon the court to proceed cautiously in resolving this issue, especially in light of the broad proclamations in *Seminole Tribe* regarding the subordinate position occupied by Article I powers (of which, of course, the spending power is one) relative to the federal jurisdictional strictures contained in Article III. In fact, the defendants argue that there exist certain constitutional limits to the types of conditions that may be imposed upon states pursuant to the spending power, and, while conceding that such limits are ill-defined, they assert that conditioning relinquishment of constitutional immunity on receipt of federal funds exceeds the permissible bounds erected by the eleventh amendment and related principles of federalism enunciated in *Seminole Tribe*. Thus, the court must carefully determine whether these principles foreclose the outcome urged by the United States Attorney General.

As previously stated, in the portion of *Seminole Tribe* most relevant to this action the Supreme Court was confronted with a precisely defined, and limited, question: "whether Congress has the power to abrogate unilaterally the States' immunity from suit." 116 S.Ct. at 1125. Consequently, the Court's answer to this question, that only pursuant to its power under § 5 of the fourteenth amendment may Congress effect a valid abrogation of states' immunity, was provided in relation to congressional efforts, via legislative fiat, to circumvent Article III's jurisdictional limits using Article I powers. Thus, *Seminole Tribe* should be read for the somewhat limited—though undeniably significant—proposition that Congress lacks the authority to thrust abrogation upon the states unilaterally, simply by passing legislation pursuant to its Article I powers, and thereby to upset the constitutional balance between state and federal power achieved by Article III and the eleventh amendment. *See* 116 S.Ct. at 1128.

By contrast, *Seminole Tribe* did not address in any significant fashion the question

most pertinent to the waiver question here, that is, whether Congress may constitutionally rely upon a specific Article I power, the spending power, not to impose abrogation on potentially unwilling states, but instead to condition provision of federal funds on a state's voluntary waiver of its sovereign immunity. In fact, the Court did not discuss the spending power at all when it broadly proclaimed that Article I powers may not be employed to circumvent Article III's jurisdictional limitations. *See Seminole Tribe,* 116 S.Ct. at 1128. Because the spending power is substantially different from the other powers granted Congress in Article I, in that Congress does not wield this power to impose its will on potentially unwilling states, it is apparent that the Supreme Court did not intend in *Seminole Tribe* to include the spending power within its expansive language regarding the subordinate position occupied by Article I powers relative to Article III. Accordingly, even the most expansive language in *Seminole Tribe* should not be read as curtailing Congress's spending clause power to condition receipt of federal funds on states' waiver of their sovereign immunity.

Moreover, the court notes that the Supreme Court observed in the portion of the *Seminole Tribe* decision that overruled *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), that waiver by a state of its sovereign immunity is

an "unremarkable, and completely unrelated, proposition." 116 S.Ct. at 1128. Thus, the Court recognized that the long-settled notion that states may voluntarily waive their immunity did not run afoul of the principles of federalism upon which the holding in *Seminole Tribe* rested.

This observation in *Seminole Tribe* regarding waiver was made in an effort to discredit the *Union Gas* plurality's earlier reliance upon *Parden v. Terminal Ry. of Ala. Docks Dep't,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), as establishing that Congress may abrogate states' sovereign immunity pursuant to its commerce clause power. *Seminole Tribe,* 116 S.Ct. at 1128 (citing *Parden*); *see Union Gas,* 491 U.S. at 14, 109 S.Ct. at 2281. Significantly, *Parden* concerned not an express statement by a state that it intended to waive its immunity, nor waiver by means of general appearance in litigation; instead, *Parden* found that the State of Alabama had waived its sovereign immunity and consented to suit by commencing operation of an interstate railroad approximately 20 years after enactment of the Federal Employers' Liability Act, which authorized such suit.[4] *See* 377 U.S. at 192–96, 84 S.Ct. at 1213–15. Thus, it is apparent that the 'unremarkable' proposition to which the *Seminole Tribe* Court alluded was not limited to waiver based upon express consent to suit, but instead also encompassed a form of waiver analogous to

---

4. Several courts have questioned the continued vitality of this aspect of the *Parden* decision in the wake of *Seminole Tribe. See Close v. New York,* 125 F.3d 31, 39–41 (2d Cir.1997); *Digiore v. Illinois,* 962 F.Supp. 1064, 1075 (N.D.Ill.1997); *American Fed'n of State, County and Mun. Employees, AFL–CIO v. Virginia,* 949 F.Supp. 438, 442 (W.D.Va.1996). Whether or not these courts are correct is immaterial to the analysis here, however. This court stresses that it does not specifically rely upon the so-called 'Parden doctrine' of constructive consent in support of its decision; rather, the court points to the *Seminole Tribe* Court's reference to *Parden* to establish that *Seminole Tribe* did not disturb the long-settled notion that states may, under proper circumstances, voluntarily waive their sovereign immunity, even absent an express statement of consent or appearance in a lawsuit. In other words, this court does not cite *Parden* itself as direct support for a conclusion that ASU 'constructively consented' to suit, but rather relies upon the *Seminole Tribe* majority's discussion of *Parden* to show that a finding of voluntary waiver in the

face of clear congressional spending clause legislation is not foreclosed by *Seminole Tribe.*

The court also recognizes that *Parden* has been overruled to the extent that its holding conflicts with the requirement that Congress unequivocally state its intent to abrogate states' eleventh amendment immunity in a statute. *See Welch v. State Dep't of Highways & Public Transp.,* 483 U.S. 468, 477, 107 S.Ct. 2941, 2948, 97 L.Ed.2d 389 (1987) (overruling *Parden* and declaring that "Only when Congress has clearly considered the problem and expressly declared that any State which undertakes given regulable conduct will be deemed thereby to have waived its immunity should courts disallow the invocation of this defense.") (quoting *Parden,* 377 U.S. at 198–99, 84 S.Ct. at 1216 (White, J. dissenting)). This does not, however, call into question this court's conclusion that the *Seminole Tribe* Court did not disturb the 'unremarkable' proposition that states may voluntarily waive their immunity by undertaking conduct that they know will result in such a waiver pursuant to a congressional enactment.

that which the United States Attorney General contends was present here: voluntary waiver made by a state when it undertakes conduct that it knows will result in the abrogation of its sovereign immunity. This lends additional support to the United States Attorney General's position that states can waive their sovereign immunity pursuant to spending clause legislation even in light of *Seminole Tribe.*

The Supreme Court's decision in *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), reinforces this conclusion by confirming that Congress's exercise of its spending power to urge states to conform with federal standards does not disturb any principles of federalism. In *New York,* the Court held unconstitutional certain 'take-title' provisions of the Low–Level Radioactive Waste Policy Amendments Act of 1985, Pub.L. 99–240, 99 Stat. 1842 (1985), because they impermissibly sought to " 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.' " *Id.* at 175–176, 112 S.Ct. at 2428 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)). The Court reached this conclusion because the 'take-title' provision offered the states the choice of two options, either accepting ownership of certain waste or regulating the waste according to federal instructions, both of which would, standing alone, constitute an unconstitutional exercise of congressional power. *Id.*

The *New York* court distinguished the legislation at issue in that case with other methods by which Congress may validly hold out incentives to encourage states' compliance with federal policy objectives, including, of particular significance to the present lawsuit, the attachment of conditions to the receipt of federal funds under the spending power. *Id.* at 167, 112 S.Ct. at 2423. The Court stressed that such an exercise of congressional power was not inconsistent with the principles of federalism discussed above:

> "By [attaching conditions on the receipt of funds under the spending clause], as by any other permissible method of encouraging a State to conform to federal policy choices, the residents of the State retain the ultimate decision as to whether or not the State will comply. If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant.... Where Congress encourages state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people."

*Id.* at 168, 112 S.Ct. at 2424. As explained above, in Title IX Congress has opted to encourage states to comply with federal standards of nondiscriminatory conduct through just such an exercise of its spending clause power.

This court further notes that its conclusion here has been reached by at least one other court that has grappled with the question of whether Congress may require states to waive their sovereign immunity in order to obtain federal funds pursuant to the spending clause. That decision, *Clark v. California,* 123 F.3d 1267, 1271 (9th Cir.1997), concerned the Rehabilitation Act, which, like Title IX, is governed by the waiver provision in § 2000d–7. In *Clark,* the Ninth Circuit Court of Appeals held that, even if Congress has not succeeded in abrogating states' eleventh amendment immunity in the Rehabilitation Act, California has voluntarily waived its immunity by accepting funds under the Act with knowledge of the provisions of § 2000d–7, which manifest a clear intent to condition states' participation on consent to waive immunity. *Id.* In support of its holding, the Ninth Circuit cited both *Seminole Tribe*'s observation, discussed in detail above, that a state may so waive immunity even in the absence of valid congressional abrogation, and the Supreme Court's statement in *Atascadero,* also discussed above, that states may effect such a waiver by accepting federal funds where the funding statute "manifest[s] a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Clark,* 123 F.3d at 1271 (quoting *Atascadero,* 473 U.S. at 247, 105 S.Ct. at 3149–50).

For the foregoing reasons, the court finds that even the broadest statements in *Seminole Tribe* do not preclude the conclusion that a state may waive immunity by accepting federal funds subject to such a condition. Consequently, the court holds, consistent with the Supreme Court's decisions in *Atascadero* and *Dole*, that the spending clause does empower Congress to require that states waive their eleventh amendment immunity when they accept and use federal funds.

C. Whether Congress Is Obligated to Provide Notice to the States Regarding Their Liability for Private Damages under Title IX?

The court must address one additional issue before concluding that all of Beasley's claims against ASU under Title IX are not barred by the eleventh amendment. The defendants argue that Congress, even if it did constitutionally condition receipt of federal funds for education on states' waiver of their eleventh amendment immunity generally, failed in the Title IX waiver provision to satisfy the stringent notice requirements for a valid exercise of such power specifically with respect to private claims for damages. According to the defendants, because Congress did not expressly provide in § 2000d-7 for private damages remedies under Title IX, state entities such as ASU were not given adequate notice at the time they accepted federal funds that their waiver of eleventh amendment immunity could subject them to damages liability at the hands of private parties for violations of Title IX.[5]

The defendants accurately characterize the governing Supreme Court law when they point out that a stringent test applies to the determination of whether Congress has properly notified potential recipients of federal funds that they must forsake eleventh amendment immunity as a condition of obtaining those funds. *See Atascadero,* 473 U.S. at 238 n. 1, 246–47, 105 S.Ct. at 3145 n. 1, 3149 (noting that states may waive constitutional immunity in the context of a particular federal program, but that such waiver requires "an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment," and that "mere receipt of federal funds cannot establish that a State has consented to suit in federal court"); *Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540 ("The legitimacy of Congress' power to legislate under the spending power ... rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation."); *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974) ("Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights.... In deciding whether a State has waived its constitutional protection under the Eleventh Amendment we will find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.") (internal quotation marks and citations omitted).

In addition, as the defendants point out, the Eleventh Circuit has read these Supreme Court precedents to require that a spending power provision "read like a prospectus and give funding recipients a clear signal of what they are buying." *Davis,* 120 F.3d at 1399. The *Davis* court quoted a Fifth Circuit decision to explain how this principle applies to school districts: " 'Congress must be unambiguous in expressing to school districts the conditions it has attached to the receipt of federal funds.' " *Id.* (quoting *Canutillo Indep. School Dist. v. Leija,* 101 F.3d 393, 398 (5th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997)).

---

5. This argument, of course, does not pertain to Beasley's claims for equitable relief against ASU and the individual defendants, but is limited to her claims for monetary damages against the university.

The defendants contend that Congress has failed to satisfy these exacting notice standards with respect to private damages claims brought pursuant to Title IX because the spending power provision at issue here, § 2000d–7, does not set forth in the requisite unambiguous, prospectus-like terms that states must waive their sovereign immunity specifically as to such private damages claims.[6] At most, the defendants argue, the provision alerts states to the fact that receipt of federal funds is conditioned on a general waiver of eleventh amendment immunity; however, they assert, states could not possibly have understood this general waiver to extend to private claims for damages because such claims were not permitted under Title IX at the time § 2000d–7 was enacted.

As further support for this contention, the defendants maintain that the states cannot be deemed to have been on notice of the availability of private damages awards prior to February 26, 1992, the date on which the Supreme Court first held in *Franklin*, as discussed more fully below, that Title IX permits such relief. *See* 503 U.S. at 65–76, 112 S.Ct. at 1032–38. In particular, the defendants assert that prior to February 26, 1992, ASU would have understood private suits for damages to be precluded by the Eleventh Circuit's 1990 holding, in the very decision that was overruled by the Supreme Court in *Franklin*, that monetary damages may not be awarded for violations of Title IX. *See Franklin v. Gwinnett County Pub. Schools*, 911 F.2d 617 (11th Cir.1990).

The defendants' contention warrants close examination. As a threshold matter, the court notes that this challenge appears to be one of first impression for the courts. To be sure, the Supreme Court has examined, as discussed above, whether spending clause legislation provides states with sufficient notice that receipt of federal funds will trigger a general waiver of eleventh amendment immunity. Moreover, the Supreme Court has also addressed whether Congress has provided federal-fund recipients with adequate no-

tice regarding the precise *conditions* with which they must comply to remain eligible for funds under spending clause legislation. However, the court is unaware of any published decision examining the adequacy of notice as to the forms of *relief* available to plaintiffs who establish that those conditions have been violated by the funding recipients. Nor, apparently, has any court been confronted with the present question of whether states waiving their eleventh amendment immunity by accepting federal funds were given adequate notice regarding the specific remedies—that is, monetary damages versus equitable relief—for which they may be held liable. As is shown below, the absence of such case law is a result of the fact that the Supreme Court has never applied the spending clause's notice requirement to compel Congress to specify what remedies are available under a statute, but only to demand that it provide adequate notice of all statutorily-imposed conditions. Thus, the defendants here urge extension of the notice requirement beyond its present limits as defined by the Supreme Court, which, for the reasons that follow, this court refuses to do.

This observation regarding the current state of the spending clause's notice requirement is borne out by an examination of the pertinent Supreme Court decisions addressing the scope of remedies available under spending clause enactments. The most relevant of these Supreme Court decisions, because it concerned Title IX itself, is *Franklin*, in which the Court was confronted, for the first time, with the question of whether monetary damages are recoverable under the statute. 503 U.S. at 71, 112 S.Ct. at 1035. Although, as explained more fully below, *Franklin* appears superficially to address the question of whether sufficient notice was provided by Title IX as to the types of relief available to recipients of federal financial assistance for education, upon closer scrutiny it becomes evident that the only notice question that the Court discussed actually pertained to whether the statute provided adequate

---

**6.** The defendants do not contend that Title IX provides insufficient notice regarding the nondiscriminatory standards of conduct that states must comply with, nor the specific areas of compliance established by the statute, such as the

availability of athletic financial assistance or scholarships. Thus, the defendants' challenge is aimed exclusively at the sufficiency of the statute's notice to states regarding the scope of remedies available to complainants.

notice regarding the conditions that Congress imposed on funding recipients.

At the time it decided *Franklin,* the Court had already determined, in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), that Title IX was enforceable through an implied right of action; in *Franklin,* the Court described the task at hand as requiring it to ascertain the nature of the remedies that are available in a suit brought pursuant to this implied right. *Id.* The Court concluded that a damages remedy is indeed available in an action brought to enforce Title IX, at least where the violations of the statute are intentional. *Id.* at 71–75, 112 S.Ct. at 1035–37. This conclusion was reached after the Court conducted a thorough examination of both Title IX as originally promulgated and the later-enacted § 2000d–7, and determined that Congress in no way intended to circumscribe the full panoply of traditional remedies that are available to plaintiffs who pursue a private right of action under congressional enactments. *Id.* at 71–73, 112 S.Ct. at 1035–37. Importantly, then, the *Franklin* Court's conclusion that Title IX permits private plaintiffs to recover monetary damages applies to the statute as it was originally enacted in 1972; in other words, because the Court's conclusion that Congress did not intend to restrict the full range of traditionally-available remedies in Title IX was based in large part upon its investigation of the legal backdrop against which the legislation was originally promulgated in 1972, it follows that such remedies had been available under Title IX since that early date.

Having reached this decision, the *Franklin* Court turned next to the question of notice under the spending clause. Specifically, the Court rejected the respondent and United States Attorney General's invitation to extend its prior holding in *Pennhurst* (namely that remedies under spending clause enactments are limited—and do not include monetary damages—when the alleged violation was unintentional) to cases in which intentional violations are alleged. *See Franklin,* 503 U.S. at 74–75, 112 S.Ct. at 1037 (citing *Pennhurst,* 451 U.S. at 27–30, 101 S.Ct. at

1545–46). The Court explained its refusal to extend *Pennhurst* in this fashion as follows:

> "The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged. Unquestionably, Title IX placed upon the [respondent county school board] the duty not to discriminate on the basis of sex. . . . Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe."

*Franklin,* 503 U.S. at 74–75, 112 S.Ct. at 1038. Thus, the Court observed that *Pennhurst*'s restriction of remedies in the context of unintentional violations was based upon the existence of a "notice problem" that does not arise where intentional violations are alleged, and the Court found that the stringent notice requirements for spending clause legislation did not disturb its conclusion that all traditional remedies are available to enforce Title IX's strictures.

At first blush, because Beasley's complaint appears to be based solely on a charge of intentional discrimination,[7] this aspect of the *Franklin* decision, when coupled with the Court's finding that monetary damages had been available to private plaintiffs under Title IX since it was first enacted in 1972, appears to answer directly the question presented here, since it seems to compel a rejection of the defendants' argument that Title IX provides insufficient notice to states regarding the availability of monetary damages under the statute. However, further inquiry reveals that this portion of *Franklin* does not provide such a direct answer to the present question, because the "notice problem" addressed by the *Franklin* Court actually concerned the adequacy of notice of the conditions with which the states must comply (such as non-discrimination in scholarship opportunities, etc.), and not whether the states were provided with sufficient notice that the remedies available to plaintiffs for violations

---

7. *See* Complaint at ¶¶ 1, 36, and 40.

of the act's strictures include an award of monetary damages, which is the issue presented by Beasley's lawsuit. In other words, the notice concerns discussed in *Franklin* pertained to the conditions attached to Title IX, and not to the remedies that are available to plaintiffs who establish a state's non-compliance with those conditions.

To understand why *Franklin* must be read in this limited fashion, one must carefully examine two prior Supreme Court decisions, *Pennhurst* and *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 103 S.Ct. at 3229–30, 77 L.Ed.2d 866 (1983), in which the Court also addressed the scope of available remedies under spending clause legislation. As stated, the respondents and United States Attorney General in *Franklin* had based their rejected "notice problem" argument upon the Court's previous observation in *Pennhurst* that, where unintentional violations are alleged, monetary damages are not available under spending clause enactments. *See Franklin*, 503 U.S. at 74–75, 112 S.Ct. at 1037 (citing *Pennhurst*, 451 U.S. at 27–30, 101 S.Ct. at 1545–46). In his plurality opinion in *Guardians Ass'n*, Justice White provided a detailed explanation of the rationale behind this observation in *Pennhurst*, as follows:

> " '[M]ake whole' remedies are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress pursuant to its 'power under the Spending Clause to place conditions on the grant of federal funds.' " *Pennhurst State School v. Halderman*, 451 U.S. 1, 15, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). This is because the receipt of federal funds under typical Spending Clause legislation is a consensual matter: the State or other grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to

their receipt. Typically, before funds are advanced, the appropriate federal official will determine whether the grantee's plan, proposal or program will satisfy the conditions of the grant or other extension of federal funds, and the grantee will have in mind what its obligations will be. When in a later private suit brought by those for whose benefit the federal money was intended to be used it is determined, contrary to the State's position, that the conditions attached to the funds are not being complied with, it may be that the recipient would rather terminate its receipt of federal money rather than assume the unanticipated burdens.

"Thus, the Court has more than once announced that in fashioning remedies for violations of Spending Clause statutes by recipients of federal funds, the courts must recognize that the recipient has 'alternative choices of assuming the additional costs' of complying with what a court has announced is necessary to conform to federal law or 'of not using federal funds' and withdrawing from the federal program entirely. *Rosado v. Wyman*, 397 U.S. 397, 420–421, 90 S.Ct. 1207, 1221–1222, 25 L.Ed.2d 442 (1970). Although a court may identify the violation and enjoin its continuance or order recipients of federal funds prospectively to perform their duties incident to the receipt of federal money, the recipient has the option of withdrawing and hence terminating the prospective force of the injunction."

463 U.S. at 595–598, 103 S.Ct. at 3229–30 (plurality opinion) (White, J., joined by Rehnquist, J.).[8] Thus, it is clear that the concerns regarding notice that lie at the heart of *Pennhurst* pertain to funding recipients' notice about the specific conditions of conduct to which they must adhere to remain eligible for continued funding. Specifically, in that

---

8. *Guardians* was decided by a highly fragmented Supreme Court, and the five separate opinions in the case, as Justice Powell observed, engender no small amount of confusion. *See Guardians*, 463 U.S. at 607, 103 S.Ct. at 3235 (Powell, J., joined by Burger, C .J., concurring). Nonetheless, because Justice White's plurality opinion in *Guardians* provides perhaps the clearest guidance regarding the nature of the "notice problem" discussed by the majority opinion in

*Franklin*, which Justice White also authored, and because only the four dissenters in *Guardians* take umbrage with Justice White's reading of *Pennhurst*, *see Guardians*, 463 U.S. at 628–32, 103 S.Ct. at 3246–48 (Marshall, J., dissenting); *id.* at 636–638, 103 S.Ct. at 3250–51 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting), this court concludes that it may properly rely upon the quoted passage from *Guardians*.

decision the Court was concerned that states receiving federal funds could learn, after the fact in a private suit, that they were not complying with the conditions attached to the funds by Congress, due to lack of adequate notice regarding the precise nature of those conditions, and on that basis could be held liable for a damages award. Such a scenario, according to the Court, would constitute an impermissible affront to the funding recipient's right to withdraw from the federal program and thus avoid unwanted obligations and duties that courts deem necessary for compliance.

As the foregoing analysis establishes, the notice issue addressed in *Pennhurst* and *Guardians Ass'n* pertained not to the adequacy of notice regarding the availability of a monetary-damages remedy, but rather to the adequacy of notice regarding the specific conditions with which funding recipients must comply to remain eligible for continued funding, and the related question of whether the states' ability to withdraw from participation and avoid compliance with unwanted federal obligations was respected. Consequently, when the Court subsequently discussed the "notice problem" in *Franklin*, it was referring to these concerns, and not whether states that accepted federal education funds were on notice that a violation of Title IX's mandates would render them liable for an award of monetary damages, as opposed to other forms of relief. *See* 503 U.S. at 74–75, 112 S.Ct. at 1037. Because it found that Title IX unquestionably placed on schools the affirmative duty not to discriminate on the basis of sex, these twin concerns regarding lack of notice about the conditions placed on federal funds and the states' inability to forsake these funds to avoid liability for monetary damages were vitiated where the states' affirmative duty under the legislation was breached *intentionally*. *See Franklin*, 503 U.S. at 74–75, 112 S.Ct. at 1037 (observing that Title IX unquestionably placed a duty upon fund recipients not to discriminate on the basis of sex, and that "Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to prescribe"); *see also Guardians Ass'n*, 463 U.S. at 599, 103 S.Ct. at 3230 (plurality opinion)

(White, J., joined by Rehnquist, J.) (noting that where intentional discrimination is demonstrated compensatory damages may be appropriate because "there can be no question as to what the [federal fund] recipient's obligation under the program was and no question that the recipient was aware of that obligation").

Thus, the foregoing analysis indicates that the Supreme Court has addressed the spending clause's notice requirement only with reference to the specific conditions of conduct (*e.g.*, nondiscrimination, etc.) imposed upon the recipients of federal financial assistance by the legislation. The rationale for this approach to the notice issue is, in essence, that it would be unfair to compel recipients to compensate plaintiffs for violations of conditions whose precise nature was unknown to the recipients at the time of violation. If, instead, only injunctive relief is available where such unintentional violations are shown, the recipient's ability to terminate its participation in the federal program rather than assume the unanticipated burdens is accorded the proper measure of deference.

Given this underlying rationale, there is no reason why the Supreme Court's holdings regarding the spending clause's notice requirement should be extended, as the defendants urge here, to the analytically-distinct question of whether states have received adequate notice as to the remedies that may be available for violations of the conditions imposed by spending clause statutes. This court perceives nothing in the pertinent decisions to suggest that such a significant extension of the Supreme Court's reasoning is warranted.

Indeed, not requiring explicit notice as to the exact form of relief available to remedy violations of congressional enactments is consistent with the fact that it has been a long-established principle, with "deep roots in our jurisprudence," that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin*, 503 U.S. at 66, 70–71, 112 S.Ct. at 1032, 1035. Because this principle, which, as the *Franklin* Court explained, is grounded

on the judiciary's power to " 'use any available remedy to make good the wrong done' " by fashioning relief that matches the violation, *see* 503 U.S. at 66, 112 S.Ct. at 1033 (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)), is so ingrained in this country's jurisprudence, states can hardly be said to lack notice that violations of a congressional spending clause enactment could render them liable for any remedy that a court deems necessary to fully redress the wrong.

Non-extension is also consistent with the point made in *Franklin* that the "notice problem does not arise in a case ... in which intentional discrimination is alleged. Unquestionably, Title IX placed upon the [respondent county school board] the duty not to discriminate on the basis of sex.... Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe." 503 U.S. at 74–75, 112 S.Ct. at 1038. While the notice at issue was as to conditions, the comment applies with equal force to any need for notice as to remedies when the charge is intentional discrimination.

The conclusion that explicit notice is not required as to the forms of relief available under a spending clause enactment is reinforced by the fact that the *Franklin* Court, in holding that monetary damages are available under Title IX, was obviously untroubled by the question of whether the states had notice that monetary damages are among the available remedies. Surely, if the Supreme Court had been concerned that states lacked notice regarding their exposure to monetary-damages liability under Title IX, it *would not have concluded* that its adherence to the traditional presumption in favor of all available damages could withstand the respondent and United States's attack *grounded on the spending clause's stringent notice requirements.* Plainly, this attack presented the Court with an opportunity to find that monetary damages were not available *because the statute gave no notice of their availability.*

■ These observations that notice about monetary relief is not required are based in substantial part on the underlying observa-

tions that, because such notice may be attributed to the states in any event, the requirement is unnecessary. It then further follows from these underlying observations that, even if such notice were required, the requirement has been met. The defendants' argument that they reasonably relied on the Eleventh Circuit's 1990 opinion in *Franklin* holding states cannot be liable for damages under Title IX does not sway. The Supreme Court's holding in *Franklin* applies to "all events, regardless of whether such events predate or postdate [the Supreme Court's] announcement of the rule." *Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993).

Of course, the question of whether states have been given adequate notice that they may be held liable for monetary damages under Title IX is different from the question presented in the immediate lawsuit, namely whether the states have been sufficiently notified that their waiver of their eleventh amendment immunity extends to suits seeking such damages in federal courts. However, despite this difference, the observations are readily extended to the issue presented here.

Finally, it not without import that subpart (a)(2) of § 2000d–7—which provides that "remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State," and which was specifically examined by the *Franklin* Court and found to provide for monetary damages as well as equitable relief, *see* 503 U.S. at 72–73, 112 S.Ct. at 1036—is the sister provision of, and was enacted at the same time as, subpart (a)(1) of § 2000d–7, in which, as explained above, Congress provided states with notice that acceptance of federal funds for education would result in waiver of states' sovereign immunity. This proximity and clear relationship between the two provisions lends additional support to the court's conclusion that the implicit finding in *Franklin* should be extended to the present question of whether the states were provided with adequate notice that their waiver of eleventh

amendment immunity would encompass private claims for damages. *See Franklin*, 503 U.S. at 78, 112 S.Ct. at 1039 (Scalia, J., with whom Rehnquist and Thomas, JJ., join, concurring) ("The Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d–7(a)(2), must be read, in my view, ... as an implicit acknowledgment that damages are available.").

In summary, then, this court rejects the defendants' final argument regarding the alleged inadequacy of notice of the availability of monetary damages under Title IX. As explained above, this court's reading of *Pennhurst, Guardians Ass'n*, and *Franklin* indicates that the Supreme Court's adequacy-of-notice concerns apply only to the substantive provisions of the spending clause legislation at issue, where the conditions governing recipients' conduct are set forth. There is no suggestion in these decisions that the Court's concerns extend to the adequacy of notice provided regarding the form of relief that is available to plaintiffs who prove that a state or state entity has intentionally violated those substantive provisions. Moreover, even if such notice were required, the requirement has been met. Accordingly, the court concludes that the states, having been given clear notice in § 2000d–7(a)(1) that a violation of Title IX would render them susceptible to suit in federal court, may not be heard to complain that they had not received sufficient notice regarding the precise nature of the relief for which they may be held liable in such a lawsuit.

## III. CONCLUSION

Thus, consistent with the Supreme Court's reasoning in the decisions discussed above, this court concludes that states that voluntarily accepted federal funds for education after enactment of § 2000d–7 in 1986 did so with full knowledge that this action would result in the waiver of their sovereign immunity for Title IX suits generally, including those in which private plaintiffs sought relief in the form of monetary damages, at least where intentional discrimination is alleged. Accordingly, because it is undisputed that since the enactment of § 2000d–7 ASU has received and continues to receive federal funds for educational purposes, and Beasley has alleged that the university has intentionally discriminated against female athletes, the court holds that ASU has waived its eleventh amendment immunity as to the claims for monetary damages and injunctive relief brought by Beasley under Title IX. These claims are not barred by the eleventh amendment, and the court will exercise jurisdiction over them.

For the foregoing reasons, it is ORDERED that the motion for summary judgment, filed by defendants on August 7, 1997, is denied to the extent that the defendants allege that they are immune from this lawsuit under the eleventh amendment to the United States Constitution.

## SUPPLEMENTAL MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

On March 23, 1998, this court entered an order in which it held that this lawsuit, brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C.A. §§ 1681 through 1688 (West 1990), and its implementing regulations, 34 C.F.R. §§ 106.38, 106.41 (1997), is not barred by the eleventh amendment to the United States Constitution. *See Beasley v. Alabama State Univ.*, 3 F.Supp.2d 1304 (M.D.Ala.1998). The court's holding was based primarily upon its conclusion that Congress, pursuant to its spending power, validly conditioned states' receipt of federal funds for education under Title IX on their voluntary waiver of sovereign immunity, and that ASU accepted this condition and made itself amenable to suit when it accepted and used such funds.

Upon reflection, the court has decided that further clarification of its previous holding is in order. Specifically, the court believes that the question of whether Alabama or its officials were authorized to waive the state's sovereign immunity in the manner discussed in the previous order warrants further examination.

As the defendants argued in support of their motion for summary judgment on eleventh-amendment grounds, numerous deci-

sions, by both federal courts and the Alabama Supreme Court, indicate that under art. I, § 14 of the Alabama Constitution of 1901 the State of Alabama has foreclosed the possibility of waiver of its sovereign immunity under the eleventh amendment, and that neither the legislature nor any state officers are authorized to waive the state's immunity. *See Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 466–70, 65 S.Ct. 347, 351–52, 89 L.Ed. 389 (1945) (looking to "the general policy of the state as expressed in its Constitution, statutes, and decisions" to determine whether state officials have authority to waive the state's sovereign immunity); *Silver v. Baggiano,* 804 F.2d 1211, 1214 (11th Cir.1986) (citing *Ford Motor Co.* and holding that removal by state officials of a suit containing state-law claims to federal court does not result in waiver of eleventh amendment immunity unless the state officials are explicitly authorized to waive immunity by the state "in its Constitution, statutes, and decisions," and finding that no such authorization has been provided to Alabama officials); *Williams v. Bennett,* 689 F.2d 1370, 1377–78 (11th Cir.1982) (noting "Alabama's traditional reluctance to waive its sovereign immunity," as embodied in art. I, § 14, and that "the Alabama Supreme Court consistently maintains that '(s)ince our Constitution unequivocally prohibits suits against the state, the legislature may not consent to such a suit.' "); *Aland v. Graham,* 287 Ala. 226, 250 So.2d 677, 681 (1971) ("this court has held that Sec. 14 'wholly withdraws from the Legislature, or any other state authority, the power to give consent to a suit against the state.' ") (quoting *Dunn Construction v. State Bd. of Adjustment,* 234 Ala. 372, 175 So. 383 (1971)).

At first blush, these decisions appear to call into question a fundamental underpinning of the court's-previous order regarding eleventh amendment immunity, because they indicate that neither Alabama's legislature nor its officials were authorized to waive the state's immunity from suit in federal court under Title IX when they accepted federal funds for education. However, upon closer examination it becomes clear that this court's conclusion regarding waiver is based upon a legitimate extension of a still-viable principle underlying *Parden v. Terminal Ry. of Ala.*

*Docks Dep't,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), a decision that has been otherwise overruled or cast into serious doubt by subsequent Supreme Court decisions.

*Parden* was discussed in the court's previous order to illustrate that the decision in *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), left intact the notion that states may voluntarily waive their eleventh amendment immunity under appropriate circumstances. *See Beasley,* 3 F.Supp.2d at 1314 & n. 4. In *Parden,* the Supreme Court addressed the question of whether Alabama could be sued under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51 through 60 ("FELA"), which was enacted by Congress pursuant to the commerce clause. The Court found that Congress in FELA had conditioned the right to operate an interstate railroad on the states' amenity to suit in federal court. *Parden,* 377 U.S. at 189–90, 84 S.Ct. at 1211–12. The Court did not, however, conclude that Congress had unilaterally abrogated states' sovereign immunity in FELA; rather, the Court examined whether Alabama's operation of an interstate railroad in the face of FELA constituted a waiver of its immunity to suit in federal court. *See id.* at 190–98, 84 S.Ct. at 1212–16. The Court, noting that Alabama had begun operation of its railroad approximately 20 years after the enactment of FELA, found that the state had accepted the condition and therefore had voluntarily consented to suit in federal court. *See id.* at 192–96, 84 S.Ct. at 1213–15.

Two subsequent developments must be noted in order to understand the current status of the *Parden* decision. First, in 1987 the Supreme Court expressly overruled *Parden* to the extent that its holding conflicts with the requirement that Congress unequivocally state its intent to abrogate states' eleventh amendment immunity in a statute. *See Welch v. State Dep't of Highways & Public Transp.,* 483 U.S. 468, 477, 107 S.Ct. 2941, 2948, 97 L.Ed.2d 389 (1987) (overruling *Parden* and declaring that "Only when Congress has clearly considered the problem and expressly declared that any State which under-

takes given regulable conduct will be deemed thereby to have waived its immunity should courts disallow the invocation of this defense.") (quoting *Parden,* 377 U.S. at 198–99, 84 S.Ct. at 1216 (White, J. dissenting)). In essence, this overruling of one aspect of the *Parden* decision merely reflects an application of the now well-established principle that abrogation is impossible without an unequivocal expression of congressional intent. *See Welch,* 483 U.S. at 478, 107 S.Ct. at 2948 (citing *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984); *Quern v. Jordan,* 440 U.S. 332, 342–345, 99 S.Ct. 1139, 1145–1147, 59 L.Ed.2d 358 (1979)).

Second, as noted in this court's previous order, several courts have questioned, in the wake of *Seminole Tribe,* the continued vitality of the 'constructive consent' aspect of the *Parden* decision. *See Beasley,* 3 F.Supp.2d at 1314, n. 4 (citing *Close v. New York,* 125 F.3d 31, 39–41 (2d Cir.1997); *Digiore v. Illinois,* 962 F.Supp. 1064, 1075 (N.D.Ill.1997); *American Fed'n of State, County and Mun. Employees, AFL–CIO v. Virginia,* 949 F.Supp. 438, 442 (W.D.Va.1996)). The following observation by the Second Circuit in *Close* illustrates the concerns raised by these courts regarding *Parden*'s continued viability: "If Congress no longer has the power to abrogate state sovereign immunity under Article I [in view of *Seminole Tribe* ], constructive consent should not become a shunt to Article III bypassing the mandate of the Supreme Court." *Close,* 125 F.3d at 40–41. In essence, these courts are unwilling to find that states have waived their constitutional immunity under circumstances where Congress does not have the authority to act unilaterally to thrust abrogation on the states. Importantly, however, all of these decisions concern regulatory programs in which states were asserted to have agreed to comply with the Federal Labor Standards Act, 29 U.S.C.A. §§ 201 through 219 ("FLSA"), and thus to subject themselves to federal lawsuits. The courts in all of these decisions found that the FLSA was enacted by Congress under the commerce clause, and not pursuant to its spending power. As

shown below, this represents a crucial distinction between the scenarios presented in these decisions and that presented in the instant lawsuit.

 Even in the face of these subsequent repudiations of certain aspects of *Parden,* at least one principle enunciated by the Supreme Court in the decision remains viable, and this principle establishes that Alabama's officials may indeed waive the state's eleventh amendment immunity when they accept funds conditioned on such waiver under the spending power. Specifically, Alabama argued in *Parden* that under state law, including art. I, § 14 of the Alabama Constitution, it could not have waived its sovereign immunity. *See* 377 U.S. at 194, 84 S.Ct. at 1214. In support of its position, the state cited state-court decisions establishing that neither the Alabama legislature nor a state officer has the power to waive the state's immunity. *See id.* The Court firmly rejected this argument, holding that federal law must govern whether waiver has been effected and further stating:

> "This must be true whenever the waiver is asserted to arise from an act done by the State within the realm of congressional regulation; for the congressional power to condition such an act upon amenability to suit would be meaningless if the State, on the basis of its own law or intention, could conclusively deny the waiver and shake off the condition.... Where a State's consent to suit is alleged to _ arise from an act not wholly within its own sphere of authority but within a sphere—whether it be interstate compacts or interstate commerce—subject to the constitutional power of the Federal Government, the question whether the State's act constitutes the alleged consent is one of federal law. Here ... the States by venturing into the congressional realm 'assume the conditions that Congress under the Constitution attached.'"

*Parden,* 377 U.S. at 196, 84 S.Ct. at 1215 (quoting *Petty v. Tennessee–Missouri Bridge Comm'n,* 359 U.S. 275, 281–82, 79 S.Ct. 785, 790, 3 L.Ed.2d 804 (1959)). While this observation obviously is directed to congressional

regulation under the commerce clause, and to that extent has been either expressly overruled by *Welch* or implicitly overruled by *Seminole Tribe,* the Supreme Court also expressed in this passage a more fundamental point that this court understands to survive those subsequent decisions—namely, that where Congress does in fact enjoy constitutional authority to condition a state's act upon its amenability to suit in federal court, one looks to federal law to ascertain whether a valid waiver has occurred, and any state law indicating that sovereign immunity may not be waived under such circumstances holds no sway. In other words, where Congress acts within its constitutionally-granted power to enter into a semi-contractual relationship with a state, and to include the state's waiver of its sovereign immunity as a condition of the 'contract,' the state is not permitted subsequently to "deny the waiver and shake off the condition," *id.,* by claiming that it was powerless under its own laws to agree to the waiver in the first place.

The spending clause, unlike the post-*Seminole Tribe* commerce clause, does empower Congress to impose such a condition upon the states in exchange for the provision of federal funds, under *Atascadero, Pennhurst, South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), and other authorities cited in this court's previous order. Thus the concern that Congress exceeded its authority in conditioning the states' actions on a waiver of their sovereign immunity, which is present in all of the decisions discussed above that involve commerce clause legislation, including *Parden,* does not arise in the instant lawsuit, because Congress relied upon its spending clause power in enacting Title IX and the associated waiver provision. Consequently, the principle underlying the above-quoted portion of *Parden,* which has not been called into question by *Welch, Seminole Tribe,* or any other subsequent decision of which the court is aware, lends solid support to the conclusion that Alabama could, and in fact did, waive its eleventh amendment immunity when it accepted federal education funds after enactment of 42 U.S.C.A. § 2000d–7, even in the face of Alabama state law that may preclude the state legislature or any state officials from consenting to suit in federal court.